Martin, J.
delivered the opinion of the court. The attorney-general has sued out a writ of scire facias, to avoid the charter or act of incorporation of the defendants, on the ground that it is absolutely void, or that they have incurred a forfeiture of it by nonfeasance. ⅞
" There was judgment in favor of the defendants, and the state appealed.
*310 Her counsel denies the political exBtence of the legislative body, who granted the chax-tér, and urges that it is inconsistent with the constitution and laws of the united states.
He boldly contests the power of congress to govern the territories, and contends that, admitting they possess, they can not delegate, it.
On this part of the case, it Would perhaps suffice to repeat what we said a few years ago, w hen pressed to declare that the office of the special administrator had no legal existence.
“ The governor construed his commission as extending to the exercise of legislative powers, in this and similar instances, in which he never was censured. The judiciary of the late territory sanctioned his conclusion, by sustaining suits and giving judgments, in several-instances, in favor of that officer. Till the institution of the present suit, no doubt appears to have been harbored of the legality of the office. Many estates have been settled by the special administrator. Jt would he attended with monstrous consequences, if by declaring that the office never legally existed, this court were to annul the various transactions of the several incumbents who filled it.”
*311 “ When, in the case of Stewart vs. Laird, 1 Cranch, 309, a judgment whs sought to be reVersed, on the ground that the judges of the supreme court of the united states had no J power to sit as circuit judges, without having been appointed as such, (in other words, that they ought to have received distinct commissions for this purpose) that court thought it sufficient to observe that practice and acquiescence for a period of several years, commencing with the organization of the judicial system, afforded an irresistible answer, and had indeed fixed the construction; that it was a cotemporary interpretation of the most forcible nature* and this practical exposition was too strong and too obstinate to be shaken or controlled. They concluded the question was now at rest, and oughtmot to be disturbed.’’ Rogers vs. Beiller, 3 Martin, 669.
A majority of the members of this court sat for years, as j udges of the late territory. The very acceptance of their commissions was a decision, on their part, that the offices had a legal existence. Had they been afterwards convinced of the illegality of their offices, they could oily have declared it, by descending from their seats: for, if they were not legal *312 magistrates, they had no capacity to say so. ⅛ . . ' , it was their misfortune to be at several times culled upon to exercise the most solemn and awful parts of their functions — to pronounce sentence of death. Can they harbor the idea of having done this without any legal authority ?.
Can the present court say that they have, for several years past, disposed of the fortunes of their fellow-citizens, according to the acts of a legislature, which never had a legitimate existence.
If any doubt could be entertained, it would certainly vanish on consideration of the part of the constitution of the united states, to which the counsel for the state has drawn our attention:—
“ Congress have the power to dispose of and make all needful rules and regulations, with regard to the territory, or other property of the united states.”
Now a very needful regulation, with regard to the land of the united states, considered as the subject of property, is to provide «for its settlement.
The individuals who are to settle on' it, must be designated, atid When there must *313 have some kind of government given them. . ... • i- • i , . -i Otherwise, if any individual have a right to remove thither, arid those thus assembled can establish a government of their own, independent of and uncontrolled by the authority of the united states — would not the acquiescence of the latter be an implied relinquishment of their title? Would nota state thus erected, be at liberty to decline being incorporated into the union ?
The legislature of every state relieves itself from the burden of making, and the details of, particular laws, necessary or useful for the individual government of cities, towns, &c. by clothing aldermen, selectmen, trustees, commissioners, &c., under certain restrictions, with a portion of its authority. To congress, a relief of the kind, with regard to the territories of the united states, was essential. Nearly one fourth of the year was requisite for the expedition of the legislative concerns of the late territory of Orleans. It cannot be imagined that congress, a very numerous body, sitting at the distance of fifteen hundred miles, with one delegate only from that territory, could have performed the same labour in the *314 same time : and when it is considered that there were half a dozen of territories, it will seen that congress could not have legislate<^ ^or these, even if they sat during the whole year, and bestowed their whole attention exclusively on the framing of laws for the territories.
We conclude that the power of making all needful rules and regulations, in regard to the territory of the united states, implies that of providing a government for those who inhabit it; and that, as in this respect, the constitution has imposed no restraint, congress well might establish such territorial, legislative, executive, and judicial departments, as to them appeared proper.
The grant of the defendants’ charter appears to have been within the scope of the powers, vested by congress in the governor and legislative council of the territory of Orleans : for these were expressly extended to all rightful subjects of legislation.
The restriction which congress imposed waa that the territorial laws be not inconsistent with the constitution and laws of the united states; thatthey lay no person under any re *315 straint, disability or burden, on account of ... i- . . religion; that they do not dispose or the sou, tax the land of the united states, nor interfere with land claims.
The governor was directed to report the laws to the president of the united states, that they might be laid before that body, on whose disapprobation they were to cease having any validity.
We are next to enquire whether the charter violates any of these restrictions.
The counsel for the state, urges that it is inconsistent with the provisions of the 8th, 9th, and 10th sections of the first article of the constitution of thq united states.
“All duties, imposts and excises shall be uniform throughout the united states.” Sec. 8.
“ Congress shall have power to regulate commerce with foreign nations.” Id.
“ Vessels, bound to and from one state, shall not be obliged to pay duties in another.” Sec. 9.
“ No state shall, without the consent of congress, lay any duties of tonnage.” Sec. 10.
The duties, mentioned in the 8th section, are therein described to be those which are laid, “ to pay the debts, and provide for the *316 general welfare, to fill the public coffer; not . , • i , i retributions, like the toll permitted by the charter, to be received by individuals (on account 0f some improvement made by them, at their own costs) and paid by those who are benefited thereby.
As early as 1790, i. e. at the first congress, , after the adoption of the federal constitution, ! that body gave its assents to—
A law of the state of Rhode Island, to incorporate certain persons, by the name of the River Machine Company.
A law of the state of Maryland, to appoint wardens of the port of Baltimore, and an act supplemental thereto.
A law of the state of Georgia. laying and appointing a duty of tonnage, for the purpose of clearing the river Savannah, and removing wrecks and other obstructions therein. 2 L. U. S. 181, 192, 258 and 532.
Neither of these laws are within our reach; but their titles shew that probably all (and1 certainly the last) were for laying a retri- ’ bution of the same nature, as that established by the defendants’ charter. Laws for the im^ provement of a water course, by means of a duty or toll, to be levied on vessels afterwards *317 usina: it. Yet neither of the legislatures of . Rhode Island, Maryland or Georgia, nor that of the union, considered these laws as inconsistent with the constitution of the united states, because the duties laid, are not uniform throughout the united states, interfere with the exclusive power given to congress to regulate commerce, and are to be paid in one state, by vessels Coming from another.
These state laws were continued, and the continuing laws assented to, in 1793, 1798, 1800 and 1808.
In 1798, congress gave their assent to a law of the state of Massachusetts, incorporating certain persons to keep in repair a pier at the mouth of Kennebunk river, and providing a duty for their reimbursement. 3 L. U. S. 35.
In 1802, congress assented to a law of the state of Virginia, relating to the navigation of Appamatox river. Id. 474. And in 1804, to a similar one, in regard to James river. Id. 586.
In 1804, to a law of the state of South-Carolina, authorising a duty of not more than six cents per ton, on all ships and vessels of the united states, returning to the port of Charleston from a foreign port. Id. 10. The act was revived in 1809.
*318 In 1805, a law of the state of Maryland was assented to, for the collection of a duty of one cent per ton, on all foreign vessels, coming *nto Port °f Baltimore, to defray the ex-pences of quarantine regulations. Id. 640.
In 1811, the same assent was given tb a law of the state of Georgia, establishing the fees of the harbour-master of the port of Savannah. Id. 348. The act was revived in 1813.
These acts, to which our attention has been drawn, by the counsel for the state, are conclusive evidence of the early, deliberate and continued opinion of the national legislature, and of those of so many of the most important members of the union (Massachusetts, Rhode Island, Maryland, Virginia, Sputh-Car-olina and Georgia) that the navigation of water courses may be improved, and the necessary funds procured or reimbursed, by a duty-raised on vessels navigating it, commensurate with the object, with the assent of congress, without violating any of the parts of the constitution of the united states.
But it is urged, that the duty which the defendants’ charter authorises them to collect, has not been laid with this assent.
*319 It does not necessarily follow, that because . . ... the constitution requires this assent to a state, it is essential to a territorial, law.
The state laws are passed without the agency, and are beyond the control of the government of the union. Those of the governor and legislative council were passed by an officer, and an assembly composed of members, appointed by the president of the united states, and ceased to be of any force as soon as it pleased congress to express this disapproval.
The ones were therefore to be presented for the assent of congress, before they went into operation ; and this because, after they were in vigor, they were out of the control of congress. The others were not to be presented for the sanction of congress, by an explicit assent, but submitted to their consideration and silent acquiescence, which left to that body the free exercise of the right it had reserved, of annulling them at will.
But, let us view the case in the light in wffiich the counsel for the state is pleased to present it to us; as if the assent of congress was equally necessary to the territorial, as to a state, law.
*320 The constitution does not require an express assent, and the counsel for the defendant urges, that as to their charter, an implied orie's necessarily to be inferred.
This instrument bears date of July, 1805, a short time before the beginning of the first session of the ninth congress, during which it must, according to the provision cited, have been submitted to that body. The session ended, without the disapprobation of the charter.
The silence of the national legislature was a manifestation of its will, that the act should provisorily continue in force.
The same congress, at its second session, on the 3d of March 1807, manifested, by procuring to the new corporation, the gratuitous conveyance of a requisite strip of land, their wish that it should continue its operation, by prolonging the canal, which they were improving, from its basin to the Mississippi; an object, which the succeeding congress appear to have had so much at heart, that they appropriated $25,000 towards the attainment of it.
In 1814, the fourteenth, and in 1816, the fifteenth congress gave the corporation new pledges of their countenance and favor, by the grant of a lot of land, in each of these years.
*321 Repeated laws of congress, expressly ad-1 . , • , , , , ding to the means provided by the territorial legislature* for the completion of the object, for which the defendants were incorporated, may well be considered as an avowal that congress did not disapprove the law, which gave them a political existence.
The court a quo considered it so, and concluded that the charter had the implied assent of congress — a conclusion in which we readily concur.
It is further urged, that if the charter be not inconsistent with any part of the constitution of the united states, it is however so, with several acts of congress, viz. the acts of March 27th, 1804, and March 2d, 1805, anterior, arid that of February 20th, and March 3d, 1811, and April 8th, 1812, posterior, to its date.
In the act of 1804, (quoted by the counsel for the state, ante 79) 3 L. U. S. 626, we have sought in vain for the provision which the counsel recites. We have, however, found it in an act of the 3d of March 1803, to which the act of 1804 is a supplement. Id. 553, sec. 17. It is there said, “that all navigable rivers, within the territory of the united states, south of the state of Tennessee, shall be deemed to *322 be, and remain public highways.” The date . r : ° / of the act being anterior to the treaty of ces^ s*on’ Louisiana made then no part of the territory of the united states; it is not therefore clear that the provision extends to it.
The act of 1805 extends, with some modifications, the ordinance of 1787, to the territory of Orleans. One of the provisions of this instrument is, “ that all the navigable waters leading into the St. Lawrence and the Mississippi, and the carrying places between the same, shall be common highways, and for ever free, as well to the inhabitants of the territory, as the citizens of the united states, or those of any other state that may be admitted into the confederacy, without any impost, tax or duty therefor.”
The counsel for the defendants has shewn that neither the character of a public highway, nor its freedom is incompatible with its subjection to some rule. ,
Freedom does not preclude the idea of subjection to law. Indeed it pre-supposes the existence of some legislative provision, the observance of which insures freedom to us, by securing the like observance from others.
The freedom of navigation, stipulated for *323 other citizens of the united states, is that , , , ...... . . which those who inhabit the territory enjoy.
As a public highway, the river may be freely navigated by either, up and down, for the conveyance, for hire, of persons and property. Not so across, at such points where ferries are established by law, nor within a certain distance above or below. The freedom, stipulated for by the ordinance, is not so absolute, as to be inconsistent with submission to ferriage laws, securing to the citizens residing within or without the territory, the convenience of finding, at suitable places, at all times, and for a fixed compensation, the means of crossing.
Nor with quarantine laws, which forbid the advance in the midst of the shipping, anchored before a city, of vessels having, or even suspected to have on board, persons labour-ing under a contagious disease, to the danger and terror of its inhabitants.
Nor with a submission to pilotage laws, which, compelling, or inducing a pilot to venture at a greatdistance from adangerous coast, to afford his skilful aid to vessels, oblige a master, who declines his services, to make him Some compensation for his labour and risk. 2 Martin's Digest, 408. n. 7.
*324 Nor with a submission tt> a law, which provides a compensation for the labour and ex-pence, bestowed by an individual or corporation, on the improvement of the navigation of a water course, attended before with difficulty and danger, to be paid by those, who by such means navigate it with ease and safety.
But it is stated, the ordinance stipulated not Only for the freedom of navigation, but also for an exemption from any impost, tax, or duty therefor.
These words, we think, must be confined to the idea which they commonly and ordinarily present to the mind; exactions to fill tbié public coffers, for the payment of the debt, and the promotion of the general welfare of the country; not to a retribution, provided to defray the expences of building bridges, erecting causeways, or removing obstructions in a water course, to be paid by such individuals only who enjoy the advantage, resulting from such labour and expense.
We conclude, that the district judge correctly declined to consider the charter of the defendants, as inconsistent with any of the act» of congress, passed before its date.
The first act, passed since the date of the *325 charter, which is said to be incompatible there- .. . . . with, and consequently is held to repeal it, is that of the 20th of February, 1811.
Congress in this act, were pleased to impose as a condition precedent, of the admission of Louisiana into the union, that a clause should he inserted in an ordinance of the convention, which framed the state constitution, providing, 44 that the river Mississippi, and the navigable rivers and waters leading into the same, or into the gulf of Mexico, shall be common highways, and forever free, as well to the inhabitants of the said state, as to other citizens of the united states, without any tax, duty, impost, or toll therefor, imposed by the said state.” 4 L. U. S. 329.
The next act, is that of the third of March following, by which congress directs, that all the navigable rivers and waters of the territory of Orleans, shall be, and forever remain public highways. Id. 361.
The last is that of April 8th, 1812, by which the provisions of the clause, the insertion of which had been proposed as a condition precedent, are made conditions subsequent — of the admission of the state into the union. Id. 402.
The admission of the state into the union* *326 as soon as possible, was a matter of right, se- . • . 0 cured by the treaty of cession. To it no condition, either precedent or subsequent, could he imposed by congress.
To an anticipated admission, that body could propose conditions precedent, which the people might accept or reject.
Thus, before the population of the intended state amounted to 60,000 free persons, the number, which, under the ordinance, entitled the people to admission as a state, congress thought fit to propose an anticipated admission, on certain conditions and restrictions, which were accepted, with some modification, by the convention.
For example, congress proposed that a constitution should be framed, “ containing the fundamental princi pies of civil and religious liberty.” One was framed containing no principle of religious liberty. The only part of it in which*religion is noticed, is the 22d section, of the 2d article, providing that no clergyman, priest or teacher, of any religious persuasion, society or sect, shall be eligible to the general assembly, or to any office of profit or trust ; a restriction on, rather than a recognition of the principles of religious liberty.
*327 Congress proposed that all the records of the j . . state, of every description, should be preserved in the language in which the constitution of the united states is written. The provision was confined to the public records of the state.
The proposed clause, in the ordinance of the convention, was absolutely neglected.*
*328 The absolute acceptance of the propositions of congress, being refused, congress might have declined to receive the qualified one, and forborne for the moment, to admit the state into the unioll. This, they did not do.
They impliedly waved the absolute compliance with the proposed terms, relating to religious liberty, and the language of the records, by approving the constitution, ánd admitted the state into the union, with a proviso, that the former terms should be taken as a condition, upon which Louisiana was ⅛-corporated into the union.
In the treaty of cession, an unconditional incorporation was stipulated for. According to the ordinance, admission was promised, on an equal fooling with the origiqpl states.
Now that the state is incorporated into the union, she must be so on an equal footing, free from any condition subsequent, to which the people did not agree.
She is not admitted on an equal footing with the state of New-York, if she must allow the free navigation of the Mississippi, to the citizens of that state, while her citizens are not allowed that of the Hudson; nor if they be, while she must give a parchment security, while the state of New-York gives none.
*329 ft cannot be said, that by patting the state . government into operation, the people accepted the conditions subsequent, annexed by congress to the admission of the state. They were not called upon to consider them.
The president of the convention, who issued his proclamation for holding the elections, had no authority to accept any condition, and could not bind the people; neither could the officers, who presided at the elections. A single vote, in a parish, would have been Sufficient to elect a senator or a representative. Had the people determined to decline puting the state government into operation, by refusing to elect members of the general assembly, they could not have effected their purpose, without an almost absolute unanimity.
We conclude, that neither the existence of, the defendants, as a corporate body, nor any of their rights, under the charter, is affected by.any act of congress, passed since its date.
It does not appear to us, that there has been any alienation of the soil, nor that the bayou has ceased to be a public highway.
The court a quo acted correctly in decline *330 ing to declare that the defendants’ charter is ,. , ., -■ null and void.
The defendants have shewn that the whole of their capital has been fairly expended in improving the navigation of the bayou, clearing the canal and basin.
There is no evidence before us of the probable expenses that would attend the contin-ding the canal from the basin to the Mississippi.
They cannot command one cent of the $25,000 appropriated by congress. This sum is placed at the entire disposal of the president of the united states.
The court a quo does not appear to us, to have erred in refusing to pronounce that the defendants’ charter has been forfeited by non-feasance.
It escaped its notice, that the state can never be condemned to pay costs in her own courts, and it erred in giving judgment for the defendants, with costs.
It is therefore ordered, adjudged and decreed, that the judgment be annulled, avoid *331 .ed and reversed, and this court proceeding to . . . . T give such a judgment, as, in their opinion, ought to have been given below,
It is ordered, adjudged and decreed, that there be judgment for the defendants.

 Since the delivery of this opinion, the reporter has been informed by Mr. Fromentin, who was one of the commissioners of the state, to carry the constitution to congress, that no ordinance of the convention was sept to that body. On an examination of the papers and journal of the convention, it appears that the form of an ordinance was reported by a committee, transcribed on the records, and the consideration of it postponed ; but it is believed ño ordinance was actually passed.
The copy from which the document, 1 Martin's Dig. 132, was printed, was furnishfd by the late governor Claiborne, as that of the Ordinance ; the original, in his opinion, having been sent to congress', with the constitution.
The form reported by the committee, was drafted on the copy of an act of congress, of F ebruary 20th, 1811, printed by the public printer, (Mr. Thierry) according to the directions of the general assembly, with the acts of the session. In the copy thus printed, the clause, which relates to the free navigation of the Mississippi, was accidentally omitted. The error crept into the Digest; the pamphlet acts, printed by the public printer, having been uséd by the printer of that work, by the directions of the person employed by the legislature to prepare it.